## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHRIS G. GILKERS**                                          **CIVIL ACTION**

**VERSUS**                                                          **NO.  05-0841**

**BURL CAIN, WARDEN**                                    **SECTION "K" (2)**

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.  28 U.S.C. § 2254(e)(2)(B).

the instant petition for habeas corpus relief be **DENIED** and the petition **DISMISSED**

**WITH PREJUDICE**.

I.      STATE COURT PROCEDURAL BACKGROUND

The petitioner, Chris G. Gilkers, is incarcerated in the Louisiana State Penitentiary

in Angola, Louisiana.[2]  On June 1, 2000, Gilkers was indicted in Jefferson Parish for the

second degree murder of his wife.[3]  The Louisiana Fifth Circuit Court of Appeal

summarized the facts of the case as follows:

> On April 8, 2000, at approximately 9 p.m., Christy Gilkers and her
> half-sister, Jessica Schmidt, were home with their mother, Rita Gilkers, at 514
> Manson Street in Metairie.  Their father, Chris Gilkers was not home at the time,
> though he had been there earlier and then left. After watching T.V., Jessica
> Schmidt fell asleep and later woke up and heard her mother and stepfather
> arguing and her stepfather cursing. Jessica Schmidt got up and went towards her
> mother's room. Her mother was in her bed and her stepfather had a gun in his
> hand. Jessica's stepfather, Chris Gilkers, told her to go to her room and she
> complied.  A gunshot could be heard in Rita Gilkers' bedroom and this awakened
> Christy Gilkers.  Christy Gilkers walked into her mother's bedroom and saw her
> mother in bed and her father shaking her mother.  Following this incident, Chris
> Gilkers came into the girls' room and he was still holding the gun. He laid down
> with Jessica Schmidt and asked if she loved him.  Jessica asked her stepfather
> why was he doing this.  Chris Gilkers then went back in his wife's bedroom
> before going downstairs and out the house. After Chris Gilkers went outside into
> the backyard, Christy Gilkers locked the doors and her half-sister, Jessica, called
> the police.
>
>                               *      *      *
>
> Deputy Randall Fernandez, of the Jefferson Parish Sheriff's Office, Fourth
> District, [was] dispatched to the scene. He received information from the other
> deputies on the scene that the children had told them that their father shot their
> mother.  The officers surrounded the perimeter of the residence, because they
> were initially unsure if Chris Gilkers was still inside.

---

[2]Rec. Doc. No. 1, Petition.

[3]St. Rec. Vol. 1 of 9, Indictment, 6/1/00; St. Rec. Vol. 4 of 9, Grand Jury Return, 6/1/00

*   *   *

As Officer Fernandez exited the house, he saw a white male run from between two houses and into the street. The officer gave chase westbound on Manson Street. The subject jumped a gate and hid behind a barbecue pit. Once cornered, it took five officers to handcuff the subject because he was screaming, struggling and fighting. When apprehended, the subject, later identified as Chris Gilkers, had blood on his shorts and socks. There was also dried blood on Gilkers' side, front, back and hands. Additionally, there were scratches on his back. Following his arrest, Gilkers was searched, and, in his pockets, police found a large amount of cash, a .9mm round of ammunition, and a wallet with his identification. Gilkers was placed in a police car and taken to police headquarters.

At police headquarters, Gilkers met with Homicide Detective David Morales. Detective Morales advised Gilkers of his Miranda rights. Detective Morales did not smell alcohol on Gilkers and his speech was not slurred, nor did Gilkers stagger, although Detective Morales recognized that the defendant was intoxicated. Gilkers gave a videotaped statement to Detective Morales wherein he stated that he and his wife had argued about money and he left the house about 8:30 p.m. He drank a 12-pack of beer and drove around. He acknowledged that he had a .9mm Ruger handgun that he kept at home in the top dresser drawer. He stated that he could not remember that the gun discharged. He stated that all he remembered was arguing with his wife then she was lying in a pool of blood.

An autopsy of the victim, Rita Gilkers, was conducted on April 8, 2000. The autopsy revealed no signs of a struggle and the cause of death was determined to be from a single gunshot wound to the head.

Gilkers presented three witnesses who testified concerning the amount of alcohol he had consumed on the night of the killing. Among the three, Carl Knight, Gilkers' nephew, testified that he was present with Gilkers on the night of the murder, at approximately 11:00 or 11:30 p.m., at Wayne's World, a bar located at Hyman Street and Jefferson Highway. According to Knight, Gilkers drank two pitchers of beer and two shots of liquor. Knight stated that he did not feel it was safe for Gilkers to drive that night and that he tried to get Gilkers to wait a half-hour before leaving the bar. Gilkers refused, jumped in his truck and left. According to Knight, when Gilkers walked to his truck he had a gun sticking out of his back pocket.

The defendant, Chris Gilkers, took the stand in his own defense. He testified that, on the night of the murder, he arrived home about 7:00 or 7:30 p.m. and unloaded his truck. He ate, drank two beers and went to the Auto Zone, before returning home again at about 8:30 p.m. He testified that he then left home and went to the store to get a 12-pack of beer and that he drank between 9 and 12 beers. Thereafter, Gilkers left for Wayne's World where he met his sister and nephew. According to Gilkers, he drank two pitchers of beer and between six and seven shots of liquor before leaving the bar. Gilkers also testified that his sister

3

tried to stop him from leaving, and that he arrived home but did not remember driving. Gilkers admitted killing his wife, but stated that he did not intend to do this. He said the gun was loaded and in his hand. He claimed that he stumbled and that the gun fired, striking his wife. He testified that he remembers the "bang" and that he went to his wife, held her and moved her on the bed. Gilkers testified that he was very drunk. He said he got blood on him from moving his wife and he got blood on the walls from running through the house. He denied ever intentionally pointing a gun at his wife. According to Gilkers, his daughter, Jessica, told him to leave. He said he left the house in a panic and passed out on the ground. When he awoke, he saw the blood on him and went home, where he was apprehended by police.

*   *   *

Christy Gilkers testified that the night before her mother's death, the victim was reading to her from the book "Little House on the Prairie." According to Christy, Gilkers entered the room and told her mother that he was going to "blow her brains out some day." Christy then testified that her father took the book and threw it across the room. Christy also testified that the week before her death that her mom was cooking. The victim and Gilkers were arguing and Gilkers had a gun. Gilkers held the gun to her mother's head. According to this child, Gilkers was not living with them a couple of nights before her mother's murder, and his clothing was not at their Manson Street apartment.

State v. Gilkers, 820 So.2d 1152, 1154-56 (La. App. 5th Cir. 2002); State Record Volume 2 of 9, Fifth Circuit Opinion, 01-KA-1379, p. 4-8, May 29, 2002.

Gilkers was tried before a twelve-person jury on May 9, 10, 11, 14, and 16, 2001.[4] During the course of the trial, the State objected to the trial court's granting of Gilkers's request to include a responsive verdict of and jury charge on negligent homicide.[5] The Louisiana Fifth Circuit Court of Appeal also denied the State's writ application on that

---

[4]St. Rec. Vol. 1 of 9, Trial Minutes, 5/9/01; Trial Minutes (2 pages (5/10/01); Trial Minutes (2 pages), 5/11/01; Trial Minutes, 5/14/01; Trial Minutes, 5/16/01; St. Rec. Vol. 4 of 9, Trial Transcript, 5/9/01; St. Rec. Vol. 5 of 9, Trial Transcript, 5/10/01; Trial Transcript, 5/11/01; St. Rec. Vol. 6 of 9, Trial Transcript (continued), 5/11/01; St. Rec. Vol. 7 of 9, Trial Transcript, 5/14/09; Trial Transcript, 5/16/09.

[5]St. Rec. Vol. 1 of 9, Trial Minutes, 5/11/01; Trial Minutes, 5/14/01; Defense Request for Special Jury Charge, 5/15/01; Minute Entry, 5/15/01; St. Rec. Vol. 7 of 9, Motion Hearing Transcript, 5/15/01.

issue.[6]  The Louisiana Supreme Court, however, granted the State's writ application on May 15, 2001, finding that negligent homicide was not a responsive verdict to second degree murder.[7]  Thereafter, upon completion of the trial on May 16, 2001, Gilkers was found guilty as charged of second degree murder.[8]

Gilkers's counsel filed a motion for a new trial, arguing that newly discovered evidence showed that Christy Gilkers's rebuttal testimony was false and could be impeached by the testimony of Carl Knight, who had already testified at trial.[9]  At a hearing held July 17, 2001, the trial court denied the motion and sentenced Gilkers to life imprisonment without benefit of parole, probation or suspension of sentence.[10]

On appeal, Gilkers's counsel asserted two substantive grounds for relief:[11] (1) The trial court erred in denying the motion for a new trial based on newly discovered

---

[6]St. Rec. Vol. 1 of 9, 5th Cir. Order, 01-K-522; 5th Cir. Writ Application, 01-K-532, 5/16/01; 5th Cir. Order, 01-K-532; St. Rec. Vol. 9 of 9, 5th Cir. Writ Application, 01-K-522, 5/14/01.

[7]State v. Gilkers, 792 So.2d 741 (La. 2001); St. Rec. Vol. 1 of 9, La. S. Ct. Order, 2001-KK-1400, 5/15/01; La. S. Ct. Letter, 01-LL-1400, 5/17/01; St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 01-KK-1400, 5/14/01; Motion for Clarification and Stay Order, 01-KK-1400, 5/15/01; St. Rec. Vol. 7 of 9, Motion Hearing Transcript, 5/15/01.

[8]St. Rec. Vol. 1 of 9, Jury Verdict, 5/16/01; Trial Minutes, 5/16/01; St. Rec. Vol. 7 of 9, Trial Transcript, 5/16/09.

[9]St. Rec. Vol. 1 of 9, Motion for New Trial, 7/16/01; St. Rec. Vol. 7 of 9, Sentencing Transcript, 7/16/01.

[10]St. Rec. Vol. 1 of 9, Trial Court Order, 7/16/01; Sentencing Minutes, 7/16/01; Sentencing Transcript, 7/16/01.

[11]He also requested an errors patent review.  State v. Gilkers, 820 So.2d at 1156; St. Rec. Vol. 2 of 9, 5th Cir. Opinion, 01-KA-1379, p. 8, 5/29/02.

evidence. (2) The trial court erred when it refused to allow a special jury charge on negligent homicide and the jury had insufficient information to understand that if the victim's death resulted from negligent homicide, he was not guilty of second degree murder. On May 29, 2002, the Louisiana Fifth Circuit affirmed Gilkers's conviction, finding his claims without merit.[12]

On June 28, 2002, Gilkers filed a mandamus motion seeking to compel the clerk of court to produce the names of grand jury forepersons between 1995 and 2001.[13] The trial court denied the motion on July 11, 2002 because the clerk of court had already advised Gilkers that it did not have such records.[14]

Thereafter, on July 16, 2002, Gilkers filed a writ application in the Louisiana Supreme Court seeking review of his direct appeal.[15]

Several weeks later, on August 6, 2002, Gilkers filed a notice of his intent to seek writs on the trial court's denial of his mandamus motion.[16] Pursuant to La. App. Rule 4-

---

[12]Id.

[13]St. Rec. Vol. 2 of 9, Petition for Writ of Mandamus, 6/28/02.

[14]St. Rec. Vol. 2 of 9, Trial Court Order, 7/11/02.

[15]St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 02-KO-1947, p. 2, 7/16/02; St. Rec. Vol. 2 of 9, La. S. Ct. Letter, 2002-KO-1947, 7/16/02.

[16]St. Rec. Vol. 2 of 9, Notice of Intent to Seek a Remedial Writ Application, 8/6/02.

3,[17] the trial court set the return date for August 22, 2002 on the mistaken belief that it had ruled on July 22 rather than July 11.[18]

In spite of this order, Gilkers filed a writ application in the Louisiana Fifth Circuit on August 27, 2002.[19]  The court denied the application on August 30, 2002.[20]

Two months later, on October 29, 2002, Gilkers filed another writ application in the Louisiana Supreme Court seeking review of the appellate court's  denial of relief on the mandamus issue.[21]

In the meantime, on January 29, 2003, Gilkers submitted a motion to proceed in forma pauperis to the state trial court.[22]  The trial court denied the motion on February 3, 2003, because Gilkers had no matter pending in the court to which the pauper status could be applied.[23]

_____

[17]La. App. Rule 4-3 provides that the application must be filed within 30 days after the trial court's ruling.

[18]St. Rec. Vol. 2 of 9, Trial Court Order, 8/13/02.

[19]The record does not contain a copy of this writ application.  The filing date appears on the face of the order and has been confirmed by my staff with the clerk of the Louisiana Fifth Circuit.  St. Rec. Vol. 2 of 9, 5th Cir. Order, 02-KH-888, 8/30/02.

[20]St. Rec. Vol. 2 of 9, 5th Cir. Order, 02-KH-888, 8/30/02.

[21]St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 02-KH-2668, 10/29/02; St. Rec. Vol. 2 of 9, La. S. Ct. Letter, 2002-KH-2668, 10/29/02.

[22]St. Rec. Vol. 2 of 9, Motion to Proceed as a Pauper, 1/29/03.

[23]St. Rec. Vol. 2 of 9, Trial Court Order, 2/3/03.

Finally, on June 6, 2003, the Louisiana Supreme Court denied without reasons Gilkers's July 16, 2002 writ application seeking untimely review of his direct appeal.[24] Later, on October 10, 2003, the Louisiana Supreme Court also denied without reasons Gilkers's writ application filed October 29, 2002 seeking review of the denial of his mandamus motion.[25]

On October 23, 2003, Gilkers filed with the state trial court a pro se application for post-conviction relief asserting four grounds:[26] (1) The evidence at trial was insufficient to support a conviction for second degree murder because the evidence did not establish specific intent and the petitioner was too intoxicated to form a specific intent. (2) He was denied a fair trial because the State introduced "other crimes" evidence on rebuttal without notice. (3) He was denied effective assistance of counsel because his counsel failed to call witnesses, put on a defense, inform petitioner of a plea offer or act as an advocate. (4) La. Code Crim. P. art. 814 regarding responsive verdicts for second degree murder was unconstitutional because it prohibits the responsive verdict of negligent homicide.

---

[24]State v. Gilkers, 845 So.2d 1087 (La. 2003); St. Rec. Vol. 2 of 9, La. S. Ct. Order, 2002-KO-1947, 6/6/03.

[25]State ex rel. Gilkers v. State, 855 So.2d 338 (La. 2003); St. Rec. Vol. 2 of 9, La. S. Ct. Order, 2002-KH-2668, 10/10/03.

[26]St. Rec. Vol. 2 of 9, Application for Post Conviction Relief, 10/23/03.

On November 5, 2003, the state trial court denied the application.[27]  The court held that review of the sufficiency of the evidence claim was procedurally barred for failure to raise it on direct appeal, review of the "other crimes" evidence and responsive verdict claims were barred as repetitive of claims already addressed on direct appeal, and the ineffective assistance of counsel claim was without merit.

On November 21, 2003, Gilkers filed in the trial court a notice of intent to file a writ application regarding this ruling.[28]  Citing La. App. Rule 4-3, the state trial court set the return date for December 5, 2003.[29]

In spite of this, Gilkers did not file an application for supervisory writs in the Louisiana Fifth Circuit until December 10, 2003.[30]  The Louisiana Fifth Circuit denied the application on December 15, 2003, because the application disclosed no error in the trial court's ruling.[31]

---

[27]St. Rec. Vol. 2 of 9, Trial Court Order (2 pages), 11/5/03.

[28]St. Rec. Vol. 3 of 9, Notice of Intent to Apply for Writs of Certiorari and/or Review, 11/21/03.

[29]St. Rec. Vol. 3 of 9, Trial Court Order, 11/25/03.

[30]The record does not contain a file-stamped copy of this writ application. The filing date appears on the face of the order and has been confirmed by my staff with the clerk of the Louisiana Fifth Circuit. St. Rec. Vol. 3 of 9, 5th Cir. Order, 03-KH-1427, 12/15/03. The record does contain a courtesy copy filed with the state trial court which bears a filing date of December 5, 2003 and received by the en banc law clerk on December 8, 2003. St. Rec. Vol. 3 of 9, Application for Supervisory Writs, 12/5/03; Memo from En Banc Law Clerk, 12/8/03. The submission in the wrong court would not be properly filed and would not warrant tolling of the AEDPA statute of limitations period.

[31]St. Rec. Vol. 3 of 9, 5th Cir. Order, 03-KH-1427, 12/15/03.

On January 22, 2004, Gilkers filed a writ application in the Louisiana Supreme Court challenging the denial of relief on his four post-conviction claims.[32] The Louisiana Supreme Court denied the application without reasons on January 14, 2005.[33]

On March 8, 2005, Gilkers filed another application for mandamus relief in the state trial court seeking production of the names of the grand jury forepersons between 1995 and 2001.[34] The trial court denied the mandamus motion as repetitive on March 14, 2005.[35]

## II.   FEDERAL HABEAS PETITION

On March 18, 2005, Gilkers filed a petition for federal habeas corpus relief in this court seeking relief on the following grounds:[36] (1) The evidence at trial was insufficient to support a conviction for second degree murder because the evidence did not establish specific intent and the petitioner was too intoxicated to form a specific intent. (2) He was denied a fair trial because the State introduced "other crimes" evidence on rebuttal without notice. (3) He was denied effective assistance of counsel because his counsel failed to call witnesses, put on a defense, inform petitioner of a plea offer or act as an

---

[32]St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 04-KH-0217, 1/22/04; St. Rec. Vol. 3 of 9, La. S. Ct. Letter, 2004-KH-217, 1/22/04.

[33]State ex rel. Gilkers v. State, 889 So.2d 256 (La. 2005).

[34]St. Rec. Vol. 3 of 9, Application for Writ of Mandamus, 3/8/05.

[35]St. Rec. Vol. 3 of 9, Trial Court Order, 3/14/05.

[36]Rec. Doc. No. 1, Petition and Memorandum in Support, p. 12.

advocate.  (4) La. Code Crim. P. art. 814 regarding responsive verdicts for second degree

murder was unconstitutional because it prohibits the responsive verdict of negligent

homicide.

The State filed a response to the petition alleging that Gilkers's first claim is in

procedural default, his fourth claim fails to allege a federal issue, and his two other

claims are without merit.

III.    STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L.

No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation,

including 28 U.S.C. § 2254.  The AEDPA went into effect on April 24, 1996[37] and

applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198

(5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore

applies to Gilkers's petition, which, for reasons discussed below, is deemed filed in this

court on February 23, 2005.[38]

---

[37]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[38]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed Gilkers's petition on March 18, 2005. Gilkers, however, signed the petition on February 23, 2005, which is the earliest date he could have submitted it to prison officials for mailing.

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

In a prior report and recommendation, I addressed the timeliness of Gilkers's petition and recommended that it be dismissed as time-barred.  Record Doc. No. 7.  The presiding district judge rejected the report and recommendation and remanded the matter to the magistrate judge for consideration of the claims.  Record Doc. No. 9.

IV.   PROCEDURAL DEFAULT

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment.  Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir. 1995) (citing Harris v. Reed, 489 U.S. 255, 260, 262 (1989)).  This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review.  Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly

and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar.  Harris, 489 U.S. at 263; Glover, 128 F.3d at 902.  When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, it is presumed that the court relied upon the same grounds as the last reasoned state court opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

In his first claim before this court, Gilkers alleges that the evidence was insufficient to support the conviction for second degree murder.  Gilkers raised this claim in his application for post-conviction relief.  The state trial court determined that the claim was in procedural default because it could have been raised on direct appeal and was not.  The basis for the court's dismissal can be found in La. Crim. Code P. art. 930.4(c), which provides for dismissal of a post-conviction application if it raises a claim which should have been raised on appeal.  The Louisiana Fifth Circuit and the Louisiana Supreme Court offered no other reasons for dismissal of the subsequent writ applications to those courts.

A.    INDEPENDENT AND ADEQUATE

For the foregoing state-imposed procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate.  A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar.  Amos, 61 F.3d at 338.  To be "adequate," the state procedural rule must be strictly or regularly followed

and evenhandedly applied to the majority of similar cases.  Glover, 128 F.3d at 902.  A state procedural bar is presumptively adequate when the state court expressly relies on it in deciding not to review a claim for collateral relief.  Id.

La. Code Crim. P. art 930.4(c) is clearly an independent state law procedural basis for denying review of an untimely raised post-conviction claim.  Bennett v. Whitley, 41 F.3d 1581 (5th Cir. 1994) (Article 930.4 is independent and adequate basis to federal review); Washington v. Cain, 2000 WL 863980 (E.D. La. June 27, 2000) (same).

The record reveals no reason why Gilkers's sufficiency of the evidence claim could not have been raised on direct appeal.  The basis for the claim was available from the record and the case law at the time of filing of the direct appeal.  Because the claim could have been raised on appeal, Article 930.4 was adequate to prevent review of the claim on post-conviction review.  Washington v. Cain, 2000 WL 863980 (E.D. La. June 27, 2000); State ex rel. Williams v. State, 786 So.2d 93 (La. 2001).

For these reasons, there exists an independent and adequate state procedural bar which prohibits federal review of Gilkers's sufficiency of the evidence claim.

B.     CAUSE AND PREJUDICE

A federal habeas petitioner may be excepted from the procedural default rule only if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice."  Glover, 128 F.3d at 902 (citing Coleman, 501 U.S. at 731-32);

<u>Amos</u>, 61 F.3d at 338-39 (citing <u>Harris</u>, 489 U.S. at 262; <u>Engle v. Isaac</u>, 456 U.S. 107, 129 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.  <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).  The mere fact that petitioner failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.  <u>Id</u>. at 486.

In this case, Gilkers has not offered any cause for the default which would excuse the procedural bar imposed by Louisiana law.  My review of the record does not support a finding that any factor external to the defense prevented Gilkers from raising the claims in a procedurally proper manner.  The record also does not reflect any action or inaction on the part of the State which prevented him from doing so.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown."  <u>Hogue</u>, 131 F.3d 466, 497 (5th Cir. 1997) (citing <u>Engle</u>, 456 U.S. at 134 n.43).  Having failed to show an objective cause for his default, the court need not determine whether prejudice existed, and Gilkers has not alleged any actual prejudice.  <u>Ratcliff v. Estelle</u>, 597 F.2d 474 (5th Cir. 1979) (citing <u>Lumpkin v. Ricketts</u>, 551 F.2d 680, 681-82 (5th Cir. 1977)).

Gilkers's sufficiency of the evidence claim is therefore procedurally barred from review by this federal habeas corpus court.  See Trest v. Whitley, 94 F.3d 1005, 1008 (5th Cir. 1996) (habeas review precluded when petitioner neglected to allege actual prejudice and cause of failure to comply with state procedural rule concerning time restriction on filing for state post-conviction relief), vacated on other grounds, 522 U.S. 87 (1998).[39]

C.     FUNDAMENTAL MISCARRIAGE OF JUSTICE

Gilkers may avoid this procedural bar only if a fundamental miscarriage of justice will occur if the merits of his claim are not reviewed.  Hogue, 131 F.3d at 497 (citing Sawyer v. Whitley, 505 U.S. 333, 339 (1992)).  To establish a fundamental miscarriage of justice, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence."  Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986); accord Murray, 477 U.S. at 496; Glover, 128 F.3d at 902.  To satisfy the factual innocence standard, petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt.  Campos v. Johnson, 958 F. Supp. 1180, 1195 (W.D. Tx. 1997) (footnote omitted); Nobles, 127 F.3d at 423 n. 33 (actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no

---

[39]The Supreme Court vacated the Fifth Circuit's opinion on grounds that a court of appeals is not required to raise the procedural default argument sua sponte. Id.

reasonable factfinder would have found the applicant guilty of the underlying offense.")

When the petitioner has not adequately asserted his actual innocence, his procedural

default cannot be excused under the "fundamental miscarriage of justice" exception.

Glover, 128 F.3d at 903.

Gilkers does not present and the record contains nothing that suggests his actual

innocence.  He does not deny killing his wife and presents nothing to this court that

differs from the evidence presented to the jury at trial.  His habeas claims address

procedural failings in the underlying criminal proceedings and not any alleged actual

innocence.  For these reasons, Gilkers has failed to overcome the procedural bar to

review of the sufficiency of the evidence claim.  The claim is procedurally barred and

must be dismissed with prejudice for this reason.

V.      STANDARDS OF A MERITS REVIEW OF THE REMAINING CLAIMS

Gilkers has asserted three other claims which are not procedurally barred.[40]  As to

the non-barred claims, 28 U.S.C. §§ 2254(d)(1) and (2), as amended by the AEDPA,

contain revised standards of review for questions of fact, questions of law and mixed

---

[40]I am aware that the state trial court barred review of two of these claims on post-conviction review because the "other crimes" evidence and the responsive verdict claims were repetitive of claims addressed on appeal. The bar relied upon was that found in La. Code Crim. P. art. 930.4(a), which prevents further review of a claim raised on appeal because the issue was addressed in the prior proceeding. "[T]he bar imposed by article 930.4(A) is not a procedural bar in the traditional sense, nor is it a decision on the merits." Bennett v. Whitley, 41 F.3d 1581, 1583 (5th Cir. 1994). For this reason, the bar imposed on post-conviction review does not affect this court's ability to consider on habeas review the state court's review of the merits of the claims on direct appeal.

questions of fact and law in federal habeas corpus proceedings.  <u>Nobles</u>, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), <u>cert. denied,</u> 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir. 2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280-81 (5th Cir.), <u>cert. denied</u>, 531 U.S. 849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently

> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000);  Penry, 532 U.S. at 792-93;

Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state-court decision applied [a

Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting

Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone,

535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the

only question for a federal habeas court is whether the state court's determination is

objectively unreasonable."  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert.

denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to

show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25).

## VI.   OTHER CRIMES EVIDENCE (CLAIM NO. 2)

Gilkers alleges that he was denied a fair trial when the State introduced "other

crimes" evidence during rebuttal without giving him proper notice.  Specifically, Gilkers

alleges that the State called the victim's brother, James Schmidt, and Christy Gilkers, the

daughter of Gilkers and the victim.  The two were called to testify regarding prior threats

Gilkers had made toward the victim. Gilkers complains that the State failed to advise the defense about who would be called or the substance of the alleged threats.

Gilkers raised this claim in his application for post-conviction relief. The state trial court refused to consider the claim as repetitive of matters considered by the Louisiana Fifth Circuit on direct appeal.[41] On appeal, Gilkers alleged that the trial court erred in denying his motion for a new trial based on newly discovered evidence.[42] The motion was based on the allegation that Christy Gilkers's testimony about prior threats by her father was false and that another defense witness, Carl Knight, who had testified at trial, could also testify to that fact. Gilkers argued that he was unable to present Knight's testimony on that issue because Christy Gilkers was called as the State's last rebuttal witness.

The Louisiana Fifth Circuit noted that Gilkers was asked about two incidents of prior threats while on cross-examination by the State at trial. The court held, in light of that line of questioning, that the evidence related to the prior threats against his wife, the victim, were not newly discovered but instead were merely cumulative of the testimony already before the jury. The court further held that, with due diligence, Gilkers could have elicited from his nephew, Carl Knight, who testified in his case-in-chief, that he

---

[41]St. Rec. Vol. 2 of 9, Trial Court Order (2 pages), 11/5/03.

[42]State v. Gilkers, 820 So.2d at 1156; St. Rec. Vol. 2 of 9, 5th Cir. Opinion, p. 8, 5/29/02.

never heard Gilkers threaten the victim.  The court found Gilkers's claim regarding the denial of the motion for a new trial to be without merit.

In refusing to reconsider the claim on post-conviction review, the state trial court resolved that these findings by the Louisiana Fifth Circuit on direct appeal were also dispositive of Gilkers's claim that the "other crimes" testimony by Christy Gilkers was not properly noticed.[43]

This issue presents a mixed question of law and fact.  <u>Dickson v. Sullivan</u>, 849 F.2d 403, 405-06 (9th Cir. 1988).  Under the applicable standard of review, this court therefore must determine if the state court's decision is contrary to or involved an unreasonable application of Supreme Court precedent.

Gilkers alleges that the State used rebuttal testimony from Christy Gilkers and James Schmidt, the victim's brother, to establish that he made prior threats against the victim.  Gilkers argues that the testimony was used without prior notice as required by La. Code Evid. art. 404(B)(1), which prejudiced his ability to defend against it.

Habeas corpus review is, however, limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law.  <u>Jernigan v. Collins</u>, 980 F.2d 292, 298 (5th Cir. 1992).  States are free to implement procedures regarding the admission of evidence, provided that those procedures do not infringe on a constitutional guarantee.  <u>Burgett v. State of Texas</u>, 389

---

[43]St. Rec. Vol. 2 of 9, Trial Court Order (2 pages), 11/5/03.

U.S. 109 (1967).  Therefore, federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings violate due process such that the violation renders the criminal proceeding fundamentally unfair.  Lisenba v. People of the State of California, 314 U.S. 219, 236-37 (1941); Peters v. Whitley, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right.)

As a preliminary matter, Gilkers has not alleged that the admission of the evidence was improper.  Instead, he argues only that the lack of notice rendered him unable adequately to respond to the rebuttal testimony.

I first note that the record indicates that rebuttal witnesses were mentioned by the trial judge prior to the close of the defense case.  The first mention of the State's intent to reserve rebuttal witnesses was made before trial started.  The prosecutor moved to allow a potential rebuttal witness, Raymond Schmidt, the victim's father, to remain in the courtroom and not be subject to sequestration.[44]  Later, after the trial court granted the defendant's request to give a jury charge on negligent homicide, the prosecutor noted her intent to seek review.  In response, the trial court made the following comment:[45]

_____

[44]St. Rec. Vol. 5 of 9, Trial Transcript, p. 9-111, 5/10/01.

[45]St. Rec. Vol. 6 of 9, Trial Transcript (continued), p. 278, 5/11/01.

Well, the defense will be putting on the remainder of its case.  You have rebuttal witnesses.  As long as you have the staff to direct its efforts towards getting your writ taken in a timely fashion, I have no problem.

The rebuttal witnesses were referenced again by the trial court after Gilkers's cross-examination testimony with no comment of surprise from defense counsel.[46] These references would seem to indicate that rebuttal witnesses were noticed and expected to testify.

Nevertheless, in Louisiana, La. Code Evid. art. 404B(1), relied upon by Gilkers, requires that the prosecution provide "reasonable notice" in advance of trial of its intent to use evidence of other crimes, wrongs, or acts to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  However, when evidence of other crimes, wrongs, or acts "relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding," it is not subject to any notice requirements.  Quintero-Cruz v. Ward, 1996 WL 469672 at *29 (W.D. La. 1996) (citing State v. Prieur, 277 So.2d 126 (La.1973)).

Furthermore, Louisiana law provides that the prosecution has the right to rebut evidence brought by the defense.  La. Code Evid. art. 611(E).  Under Louisiana law, "rebutting evidence is that which is offered to explain, repel, counteract or disprove facts given in evidence by the adverse party."  State v. Monroe, 17 So.2d 331, 332 (La. 1944) (citation omitted).  "It is rebuttal, not impeaching, to show that the statement of the

---

[46]St. Rec. Vol. 7 of 9, Trial Transcript, p. 83, 5/14/01.

witnesses as to what occurred is not true." <u>Id</u>. at 332.  The Louisiana Code of Evidence does not require notice of rebuttal evidence, and I have neither been cited to nor located through independent research any reported decision of a Louisiana state court that would do so.

Federal courts have also recognized that "'[i]f a defendant testifies, he puts his credibility in issue.  If he lies in the course of his testimony, he lays himself open to attack by means of illegal evidence which otherwise the prosecution could not use against him.'" <u>Williams v. Wainwright</u>, 502 F.2d 1115, 1116 (5th Cir. 1974) (quoting <u>United States v. Nadaline</u>, 471 F.2d 340, 347 (5th Cir. 1973)).

In addition, in <u>State v. Johnson</u>, 475 So.2d 394 (La. App. 1st Cir. 1985), the Louisiana First Circuit Court of Appeal considered a claim similar to that raised by Gilkers.  In that case, the defendant, Leo Johnson, challenged the introduction of "new" rebuttal testimony at his trial for the murder of his estranged wife.  Johnson testified at trial that he loved his wife, missed her and had never threatened to kill her. He specifically denied threatening her life during a telephone call she made to him from New York about one week before the murder.  <u>Id.</u> at 398.  The trial court allowed as rebuttal the testimony of the Johnsons' son, Ray.  Ray testified that he answered the telephone when his mother called from New York.  He heard his father threaten his mother saying "one of us is going to hell."  The Louisiana First Circuit held that the evidence was properly offered in rebuttal.  <u>Id.</u> at 398.

In this case, Gilkers testified that he loved his wife and denied that he had threatened or been violent towards her prior to the night of her murder.  The prosecutor was therefore "entitled to introduce evidence rebutting this 'specific false statement made from the witness stand.'"  Williams, 502 F.2d at 1116.  The prosecutor did so through the testimony of Christy Gilkers and James Schmidt as allowed under Louisiana law.

In addition to these evidentiary considerations, the record shows that Gilkers was on notice that the prosecution was attempting to establish prior incidents of violence. Gilkers's defense was that the shooting accidently occurred while he was verbally arguing with his wife and as a result of his extreme drunkenness and careless handling of the gun.

My reading of the trial transcript reflects that the State did not ask any of its witnesses, including the Gilkers's daughters, about a history of arguing between Chris and Rita Gilkers.  However, on direct examination by defense counsel, Gilkers testified repeatedly that he loved his wife and did not mean to hurt her.  He also testified that he and his wife had a history of arguing about his inconsistent income and his drinking but that it never became violent.  At one point, Gilkers and his counsel had the following exchange:[47]

> Q.     You and your wife had disagreed over money in the past?
> A.     Yeah.  Money.
> Q.     Had it ever become violent in any way?

_____

[47]St. Rec. Vol. 7 of 9, Trial Transcript, p. 45, 5/14/01.

A.      No, sir.

This was the first indication in the trial testimony that Gilkers denied any prior physical threats or violence when he and his wife argued. Thus, as noted by the Louisiana courts, Gilkers placed his credibility at issue on the matter of prior violence between him and his wife and opened the door for his credibility to be challenged.  See United States v. Archer, 733 F.3d 354 (5th Cir. 1984) (when the witness denies prior misconduct the prosecution can impeach with extrinsic evidence).

The defense having opened the door to address the matter on cross-examination, the prosecutor directed questions to Gilkers about his prior arguments with and threats against the victim, his wife:[48]

Q.      You never pointed a gun at your wife, Rita?
A.      No.
Q.      Do you remember about a week, a week and a half prior to this incident, you were in the kitchen and Rita was in the kitchen, and so was Christy; Rita was cooking dinner?  Do you remember that?
A.      I don't remember what you are talking about, ma'am.
Q.      You don't remember getting Rita in the corner and putting the gun up to her head?
A.      No, ma'am.
Q.      Do you remember the night before this happened?  Do you remember Rita reading the "Little House on the Prairie" book to Christy?
A.      I don't remember what went on the night before this happened.  I know I worked late all that week.
                                    * * *
Q.      Do you remember throwing the book at the TV?
A.      I never threw no book at no TV.

_____

[48]Id., at p. 55-56.

Q.     And you never looked at your wife and said "Some day I'm going to blow
        your brains out," did you?
A.     No, ma'am.

Gilkers again denied these alleged acts of violence and threats towards his wife

later when the prosecutor repeated her questions:[49]

Q.     And it's your testimony that you never ever pointed a gun at your wife's
        head?
A.     Yes, ma'am.
Q.     And you never threatened to blow her brains out?
A.     No, ma'am.

The prosecutor also asked Gilkers about another incident at Mardi Gras when

Christy refused to get on his shoulders.[50]   She asked if, at that time, he argued with his

wife and used his hand in some manner against her.   Gilkers again denied the incident.

At this point, it should have been clear to the defense that the State was attempting

to show a prior history of violence between Gilkers and the victim.   However, as noted

by the Louisiana courts, the defense did not call any other witnesses.

Instead, the next evidence presented to the jury was that of the State's rebuttal

witnesses.   Christy Gilkers testified about the threats her father had made to her mother

the night before the shooting.   She stated that he threw the book she was reading across

the room and told her mother that he would blow her brains out one day.[51]   She also

---

[49]<u>Id</u>., at p. 79-80.

[50]<u>Id</u>., at p. 63.

[51]St. Rec. Vol. 7 of 9, Trial Transcript, p. 103, 5/14/01.

recalled the incident about one week before the shooting when her father placed a gun to her mother's head and told her something Christy could not hear.[52]

James Schmidt, the victim's brother, also testified about the Mardi Gras incident, when Gilkers poked his finger into the victim's forehead and said, "Shut up or I'll kill you."[53]

Gilkers has not shown how the admission of this evidence to rebut his apparently false testimony violated due process. He offered no testimony other than his own to support the lack of prior threats, an issue raised by his own counsel. He has not demonstrated a violation of his constitutional right to a fair hearing reviewable by this court on habeas review. See Williams v. Wainwright, 502 F.2d at 1116.

The denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent. His claim is without merit.

VII.   INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIM NO. 3)

Gilkers alleges that his counsel was ineffective because he failed to call his daughters, Christy and Jessica, in the defense case-in-chief without the limitations of cross-examination. He also alleges that counsel failed to ask relevant questions to Carl Knight to counter Christy's testimony about prior threats. He also claims that his counsel should have subpoenaed his prior medical records and called an expert witness to testify

---

[52]Id., at p. 104.

[53]Id., at p. 98.

regarding the impact of his intoxication.  Gilkers also alleges that counsel failed to inform him of a plea bargain offered by the State in which he could have received only a 40-year sentence for manslaughter.

Gilkers first raised these claims in his application for post-conviction relief.  The state trial court held that the complained of acts were discretionary trial tactics.[54]  This was the last reasoned decision on the issue.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994).  Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel.

In Strickland, the court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, the court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim

---

[54]St. Rec. Vol. 2 of 9, Trial Court Order (2 pages), 11/5/03.

based solely on a petitioner's failure to meet either prong of the test. <u>Kimler</u>, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' It is not enough, however, under <u>Strickland</u> 'that the errors had some conceivable effect on the outcome of the proceeding.'" <u>Motley</u>, 18 F.3d at 1226 (quoting <u>Strickland</u>, 466 U.S. at 693).

On habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." <u>Moore v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999) (citing <u>Strickland</u>, 466 U.S. at 689-90). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. <u>Strickland</u>, 466 U.S. at 689; <u>Neal</u>, 286 F.3d at 236-37; <u>Clark v. Johnson</u>, 227 F.3d 273, 282-83 (5th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1167 (2001). "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." <u>Bell</u>, 535 U.S. at 697 (citing <u>Strickland</u>, 466 U.S. at 689).

This court must apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance."

Strickland, 466 U.S. at 690.  Federal courts have consistently recognized that tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance.  Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied, 528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) and Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise.  Strickland, 466 U.S. at 689; Moore, 194 F.3d at 591.  The burden is on petitioner to demonstrate that counsel's strategy was unreasonable.  Strickland, 466 U.S. at 689.

A.   QUESTIONING OF WITNESSES

Gilkers claims that his counsel erred by failing adequately to question Christy, Jessica, and Carl Knight to best establish his defense.  Specifically, Gilkers alleges that counsel could have asked the girls whether their father always carried his gun;  whether Jessica was home the night before the shooting or the week before the shooting to address the alleged threats about which Christy testified; and if anyone had told Christy what to say about the alleged Mardi Gras incident.  Gilkers argues that counsel also could have impeached Christy by questioning her about why she told police she saw her father shoot her mother and then changed her story to say she was awakened when she heard the shot.

The record reflects that Gilkers's defense was that the shooting was accidental and a result of his careless handling of the gun due to his severe intoxication. From this perspective, a reading of the trial transcript demonstrates that counsel zealously pursued the defense and responded to the State's attacks on it with effective questioning of the witnesses. Though Gilkers now suggests that more could have been done, <u>Strickland</u> does not require this court to second-guess in hindsight the strategy chosen by counsel.

Furthermore, the record reflects that either defense counsel or the prosecution in fact explored the lines of questioning outlined by Gilkers in this petition. For example, the trial transcript reflects that Christy Gilkers was asked by the prosecutor if anyone told her what her answers should be. Christy answered, "no."[55] There was no need for defense counsel to call Christy to ask the same question.

During rebuttal, defense counsel asked Christy if her sister Jessica was home when Chris threw the book at the television.[56] Christy indicated that Jessica was at a friend's house that evening.[57] Gilkers's counsel had no need to ask Jessica if she was home.

---

[55] St. Rec. Vol. 6 of 9, Trial Transcript (continued), p. 148, 5/11/01.

[56] St. Rec. Vol. 7 of 9, Trial Transcript, p. 105, 5/14/01.

[57] <u>Id</u>.

The record also shows that Christy did not tell police that she saw her father shoot her mother.  The statement given by Christy to detectives immediately after the murder reflects the following:[58]

| | |
|---|---|
| LT. ENGLISH: | Do you know for sure that he shot her, did you see him shoot her? |
| C. GILKERS: | I heard the banging noise and he had the gun. |
| LT. ENGLISH: | Ok and then but you were sleeping before that right? |
| C. GILKERS: | Yes. |
| LT. ENGLISH: | And then the bang woke you up right? |
| C. GILKERS: | Yes. |

This testimony is consistent with, if not identical to, Christy's testimony at trial.[59] Gilkers has not shown that his counsel could have used the prior statement to impeach Christy.

Gilkers also alleges that counsel failed to question Carl Knight about the climate in the Gilkers home.  Gilkers suggests that Knight was in their home every evening and every morning for two weeks prior to the shooting.  Gilkers, however, testified that he usually returned home late during the week leading up to the shooting and he usually got home after everyone was sleeping.[60]  He made no suggestion that he arrived home with anyone.  In addition, Gilkers does not clarify in his petition how Knight could have

---

[58]St. Rec. Vol. 3 of 9, Christy Gilkers's Statement, p. 4-5, 4/8/00.

[59]St. Rec. Vol. 6 of 9, Trial Transcript (continued), p. 138-39, 5/11/01.

[60]St. Rec. Vol. 7 of 9, Trial Transcript, p. 55, 5/14/01.

known what went on between Gilkers and the victim if the family was asleep when Knight might have been in the home.

Gilkers denied throwing the book at the television when asked by the prosecutor about the events the night before the shooting.[61]  He never mentioned that anyone else was with them in the house when he had his chance to do so.  The same is true of his denial of the threat made one week earlier.[62]  He denied that it occurred but did not mention that Knight was present when he arrived home.

When Carl Knight, Gilkers's nephew, testified on behalf of the defense, the focus of the direct examination was to elicit testimony regarding just how drunk and careless Gilkers was on the night of the shooting.  Apparently, counsel was using Knight to enforce the defense theory of accidental shooting as a result of excessive drinking and careless handling of the gun.[63]  This was consistent with the defense strategy, especially since Gilkers had already denied the allegations of prior threats to his wife.

Knight also testified that he and Gilkers went drinking two or three times a month for about a year.[64]  Knight also testified that Gilkers, the man he drank with often and

---

[61]Id.

[62]Id.

[63]See e.g., St. Rec. Vol. 6 of 9, Trial Transcript (continued), p. 212-215, 5/11/01.

[64]Id., at p. 201.

worked with every day for a month, did not carry around a gun all of the time.[65]  This was contrary to Gilkers's theory that counsel could have established that he carried the gun around all the time by calling more witnesses.

In sum, Gilkers has failed to demonstrate how counsel's questioning of the witnesses at trial was deficient performance or prejudicial to his case.  This claim is wholly without merit.

B.    <u>FAILURE TO CALL AN EXPERT AND PRESENT MEDICAL RECORDS</u>

Gilkers alleges that counsel should have hired an expert to discuss how his alcohol consumption affected him on the night of the shooting and to present medical records which would establish his long history of treatment for alcohol.

"[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy, and because allegations of what a witness would have testified are largely speculative."  <u>Buckelew v. United States</u>, 575 F.2d 515, 521 (5th Cir. 1978).  Similarly, counsel's failure to hire an expert does not fall outside a range of reasonable effectiveness under <u>Strickland</u>.  <u>White v. Ieyoub</u>, 25 F.3d 245, 250 n.29 (5th Cir. 1994); <u>Yohey v. Collins</u>, 985 F.2d 222, 228 (5th Cir. 1993).

To evaluate the effect of counsel's alleged error, petitioner would have to establish that the failure to call a defense expert rendered the trial "unreliable or the proceeding fundamentally unfair."  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993) (citing

---

[65]<u>Id</u>., at p. 206.

Strickland, 466 U.S. at 687).  Gilkers would have to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.

The record indicates that counsel made the decision not to present such evidence as part of the intoxication defense.  While discussing the concept of an instruction on negligent homicide, counsel told the court that "I do not expect any scientific evidence at this point to be brought in with respect to any particular point . . . "[66]  The decision not to introduce medical and expert testimony was clearly a tactical or strategy decision on counsel's part that should not be second-guessed.

Furthermore, Gilkers has not demonstrated how any additional expert testimony or medical evidence would have affected the outcome of the trial, especially in light of the other evidence that he was intoxicated on the night of the shooting.  The jury heard ample testimony of the amount of liquor and beer he consumed on the night of the shooting.  Gilkers engages merely in speculation that an expert for the defense or the medical records would have further emphasized the effect of the alcohol on his ability to control the gun.

The jury heard testimony from Gilkers and others about the amount of alcohol he consumed on the evening of the shooting.  The jury also heard testimony about the prior threats by Gilkers to his wife.  They also heard the testimony of Gilkers's step-daughter,

---

[66]St. Rec. Vol. 4 of 9, Trial Transcript, p. 10, 5/9/01.

Jessica, who heard him cursing at her mother, who was crying, before the shooting.  She also testified that he went to her bedroom for confirmation that she loved him before returning to her mother's room to pull the trigger.  Gilkers has not established that medical or expert testimony would have changed the verdict in light of the substantial evidence from which the jury found a specific intent to kill his wife.  This claim is also without merit.

## C.    FAILURE TO REQUEST A NEGLIGENT HOMICIDE CHARGE

The State suggests that Gilkers also has alleged that his counsel was deficient for failure adequately to request a negligent homicide charge.  My reading of Gilkers's petition does not reflect that this claim is raised before this court.  However, for the benefit of a reviewing court should Gilkers raise this claim in response to this report, I find that any such claim is baseless.

The record demonstrates the persistence of defense counsel in attempting to have negligent homicide included as a responsive verdict.[67]  The request was initially granted by the trial court after hearing much of the testimony on intoxication.[68]  Even after the State applied for review, counsel continued to argue his case to the trial court.[69]

---

[67]St. Rec. Vol. 1 of 9, Defense Request for Special Jury Charge, 5/15/01; St. Rec. Vol. 4 of 9, Trial Transcript, p. 7-9, 5/9/01.

[68]St. Rec. Vol. 6 of 9, Trial Transcript (continued), p. 277, 5/11/01.

[69]St. Rec. Vol. 7 of 9, Trial Transcript, p. 81-82, 110-111, 117-120, 5/14/01; St. Rec. Vol. 1 of 9, 5th Cir. Order, 01-K-522, 5/14/01.

When the Louisiana Supreme Court confirmed that negligent homicide was not a responsive verdict, counsel then requested to have negligent homicide defined for the jury as part of the instructions.[70]  In fact, the court interrupted trial on May 15, 2001, to conduct a full hearing on counsel's request to include the definition of negligent homicide as a defense to second degree murder in the charges and in his closing arguments.[71]  The request for a special jury instruction was denied by the state trial court, as was the subsequent writ application to the Louisiana Fifth Circuit.[72]

The record demonstrates counsel's efforts to have a negligent homicide charge or instruction given to the jury.  Counsel's performance cannot be deemed constitutionally deficient simply because he was unsuccessful.  Martinez v. Dretke, 99 Fed. Appx. 538, 543 (5th Cir. 2004).  Gilkers's claim is without merit.

D.    FAILURE TO INFORM HIM OF THE PLEA AGREEMENT

Gilkers's claim that he was not informed of the plea agreement offered by the State is also factually baseless and without merit.

A lawyer's failure to inform his client of a plea offer may amount to ineffective assistance of counsel.  Teague v. Scott, 60 F.3d 1167, 1171 (5th Cir. 1995).  However,

---

[70]State v. Gilkers, 792 So.2d 741, 742 (La. 2001); St. Rec. Vol. 1 of 9, La. S. Ct. Order, 2001-KK-1400, 5/15/01.

[71]St. Rec. Vol. 7 of 9, Motion Hearing Transcript, 5/15/01.

[72]Id., at p. 7-8; St. Rec. Vol. 1 of 9, 5th Cir. Order, 01-K-532, 5/16/01.

38

the record in this case does <u>not</u> support Gilkers's claim and instead shows that Gilkers
-was informed of the plea offer of manslaughter with a 40-year sentence.

During the presentation of witnesses by the prosecution, the court took a break to
hear the State's request that the courtroom be cleared during the testimony of the
Gilkers's daughters.   During that discussion, defense counsel made the following
statement:[73]

> MR. REGAN:      Okay.  And the second thing is once we cross over this
>                 threshold, the offer of plea is off the table, as I understand
>                 it, at this point.
>                 I'd ask that we take a short recess right now because my
>                 client needs to make a decision on that, number one . . .

After a ten minute break was taken, the state trial court and counsel for both sides
had the following exchange:[74]

> MS. MILLER:      And, Your Honor, just one more thing. The State has
>                  offered the defense a reduction to a manslaughter plea with
>                  a sentence of forty years, and I have explained throughout
>                  the pre-trials in this court and throughout the trial in this
>                  court, that the minute one of the girls takes the stand, that
>                  plea offer is revoked.  It will not be on the table any more.
> THE COURT:       All right.  And your client understands that, Mr. Regan?
> MR. REGAN:       He does, Your Honor.
> THE COURT:       All right.
> MR. REGAN:       And believe me, he has carefully weighed everything and
>                  he has spoken with his father who is present, who is
>                  himself, a lawyer and consulted with me on this matter.
>                  We simply say that that's what's been offered. We'd hope
>                  that perhaps maybe the circumstances would indicate some

---

[73]St. Rec. Vol. 6 of 9 (continued), Trial Transcript, p. 130, 5/11/01.

[74]<u>Id</u>., at p. 132-33.

|              | other thought by the District Attorney's office. But my client's position is that he would like to finish the trial. |
|--------------|------|
| THE COURT:   | All right.  Fine. |
| MS. MILLER:  | That's fine. |

The record demonstrates that the plea had been offered by the State during pretrial proceedings and remained available during trial.  Gilkers was not only informed of the plea but was given an opportunity to discuss the matter with his counsel and his father prior to its revocation by the State.

Gilkers has failed to demonstrate that his counsel did not inform him of the plea offer or that counsel's performance in this regard was deficient.  This claim is without merit.

VIII.   RESPONSIVE VERDICT (CLAIM NO. 4)

Gilkers alleges that La. Code Crim. P. art. 814 is unconstitutional because it was prejudicial to his defense.  Gilkers argues that Article 814 provides for responsive verdicts for second degree murder but does not include negligent homicide as an option. Gilkers raised this claim in his application for post-conviction relief.  The State trial court refused to consider the claim as repetitive of an issue raised on direct appeal.  On appeal, Gilkers alleged that the trial court erred in denying his request to include a special jury charge on the definition of negligent homicide.  The Louisiana Fifth Circuit held that the charge was a misstatement of the law.[75]   The court held that the charge as requested

---

[75]State v. Gilkers, 820 So.2d at 1162; St. Rec. Vol. 2 of 9, 5th Cir. Opinion, p. 19-20, 5/29/02.

would imply to the jury that Gilkers could be found guilty of negligent homicide, which was not a responsive verdict to second degree murder.[76]  The state trial court refused to consider the issue on post-conviction review because it was resolved by the findings of the Louisiana Fifth Circuit on direct appeal.

Louisiana law requires:  "When there are several grades of an offense contained in a single count, the court shall charge the jury as to each grade of which the defendant could be found guilty."  La. Code Crim. Proc. art. 804.  At the time of Gilkers's conviction, however, Louisiana law did not recognize negligent homicide as a responsive verdict to the charge of second degree murder.  State v. Gilkers, 792 So.2d 741, 742 (La. 2001) (citing La. Code Crim. P. art. 814(A)(3)); State Record Volume 1 of 9, Louisiana Supreme Court Order, 2001-KK-1400, 5/15/01.  The responsive verdicts given to the jury at Gilkers's trial were therefore an accurate statement of the law at the time.  Accord Clark v. Maggio, 737 F.2d 471, 474 (5th Cir. 1984).  This does not demonstrate error or prejudice during his trial.

Furthermore, in a non-capital case, due process does not require a state court to give an instruction on a lesser included offense and such a claim does not raise a federal constitutional issue.  Valles v. Lynaugh, 835 F.2d 126, 127 (5th Cir. 1988) (citing Alexander v. McCotter, 775 F.2d 595 (5th Cir.1985)); Easter v. Estelle, 609 F.2d 756,

---

[76]Id.

758 (5th Cir.1980).  These cases applied this rule when the offense was listed or included by state law as a lesser included offense.  Id.

In Gilkers's case, however, he claims that he should have had an instruction on an offense that was <u>not</u> included as a lesser offense to second degree murder under Louisiana law.  If a defendant has no due process right to have an instruction on a listed offense, Gilkers cannot demonstrate a due process violation as a result of the failure to instruct on an offense that is not listed under state law as a lesser included offense.

Gilkers also claims that he was prejudiced and thus denied a fair trial because he was not allowed to explain negligent homicide to the jury. In order for Gilkers to establish that his trial was unfair in violation of due process, he would have to show a "failure to observe that fundamental fairness essential to the very concept of justice.  In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." <u>Lisenba</u>, 314 U.S. at 236.

In this case, Gilkers's defense was that his wife's shooting was accidental because of his intoxication.  Gilkers was able to present his defense through witness testimony and was not denied a fair trial.

Under Louisiana law, second degree murder requires a showing that there was the killing of a human being and that the defendant had the specific intent to kill or inflict great bodily harm.  La. Rev. Stat. Ann. § 14:30.1(A)(1); <u>State v. Norman</u>, ___ So.2d ___,

42

2006 WL 619397 at *3 (La. App. 5th Cir., Mar. 14, 2006).  Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  La. Rev. Stat. Ann. § 14:10(1); <u>State v. Norman</u>, at *3.

In connection with the element of specific intent, the state trial court instructed Gilkers's jury in the following matter:

> The fact that the defendant was in an intoxicated condition at the time of the commission of the crime is usually not a defense.  However, where the circumstances indicate that an intoxication or drugged condition has precluded the presence of a specific criminal intent, or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
> The defendant's plea of intoxication or drunkenness is a special defense and, like any other defense, must be proven by him to your satisfaction.  Once the defense of voluntary intoxication is raised, the State [sic] the burden of proving beyond a reasonable doubt that the defendant had a specific intent to kill or inflict great bodily harm.
> Thus, if you find that the defendant was in such an intoxicated condition that he did not have the specific intent to kill of inflict great bodily harm required to commit second degree murder or manslaughter, you must find the defendant not guilty.

The jury was therefore instructed to consider the impact of Gilkers's intoxication on the required element of specific intent.  If the element of specific intent was not proven by the State, the jury was told they must enter a verdict of not guilty (as opposed to the negligent homicide he suggests they should have found).  The guilty verdict reflects that the jury rejected the intoxication defense.

Thus, Gilkers's inability to argue negligent homicide or have it included as a responsive verdict did not prevent him from presenting his intoxication defense.  His

counsel was able to argue the accidental nature of the shooting and introduce testimony of his intoxication.  Gilkers was not denied a fair trial.

Denial of relief on this claim was not contrary to or an unreasonable application of Supreme Court precedent.  Gilkers is not entitled to relief on this claim.

## **RECOMMENDATION**

**IT IS THEREFORE RECOMMENDED** that the petition of Chris G. Gilkers for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with

notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___10th___ day of April, 2006.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE